UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

AARON MODUGNO,

    Plaintiff,

v.

SECURE CARE 65, LLC,

    Defendant.

_____/

Case No.: 8:26-cv-1615

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, **AARON MODUGNO** ("Modugno" or "Plaintiff"), by and through undersigned counsel, hereby sues Defendant, **SECURE CARE 65, LLC** ("Secure Care" or "Defendant"), for retaliation in violation of the IRS Whistleblower Protection Provision, 26 U.S.C. § 7623(d), and alleges as follows:

### NATURE OF THE ACTION

1.    This is a civil action for retaliation in violation of the IRS Whistleblower Protection Provision, 26 U.S.C. § 7623(d), enacted by the Taxpayer First Act of 2019.

2.    Plaintiff Aaron Modugno reported to senior management of Secure Care 65, LLC that Secure Care's President, Craig Winholtz, was engaged in an ongoing tax-evasion scheme involving offshore kickbacks from Philippine vendors that concealed approximately $200,000 of taxable income from the Internal

Revenue Service in 2024 alone, in violation of 26 U.S.C. § 7201, and that the Company was claiming illegal kickback payments as deductible business expenses in violation of 26 U.S.C. § 162(c).

3. Within twenty-four hours of Plaintiff's disclosure to Secure Care's owners, Secure Care retaliated by locking Plaintiff out of all Company systems, stripping him of his Sales Manager position, and ultimately constructively discharging him. Secure Care then compounded the retaliation by filing a meritless state-court lawsuit against Plaintiff designed to punish him for his protected activity and to deter other employees from reporting tax fraud.

4. Plaintiff filed a timely complaint with the U.S. Department of Labor, Occupational Safety and Health Administration, on October 30, 2025. More than 180 days have elapsed without a final decision by the Secretary of Labor, and any delay is not the result of Plaintiff's bad faith. Plaintiff therefore brings this action de novo pursuant to 26 U.S.C. § 7623(d)(2)(B)(i).

**JURISDICTION AND VENUE**

5. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 26 U.S.C. § 7623(d)(2)(B)(i), which grants this Court jurisdiction over IRS whistleblower retaliation claims without regard to the amount in controversy.

6.  Venue is proper in the Middle District of Florida, Tampa Division, pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in Pinellas County, Florida, and Defendant's principal place of business is located in this District and Division.

7.  This Court has personal jurisdiction over Defendant because Defendant is a Florida limited liability company with its principal place of business in Clearwater, Florida, and has regular and continuous business presence within this District.

## PARTIES

8.  Plaintiff Aaron Modugno is an individual residing in the State of Florida.

9.  Defendant Secure Care 65, LLC is a Florida limited liability company with its principal place of business in Clearwater, Florida.

## ADMINISTRATIVE EXHAUSTION

10. On October 30, 2025, Plaintiff filed a timely retaliation complaint with the U.S. Department of Labor, Occupational Safety and Health Administration, Office of Whistleblower Protection Programs, pursuant to 26 U.S.C. § 7623(d)(2)(A)(i) and 29 C.F.R. pt. 1989 (the "OSHA Complaint"). The OSHA Complaint was docketed by OSHA under Case No. 301066409.

11. More than 180 days have elapsed since the filing of the OSHA Complaint, and the Secretary of Labor has not issued a final decision.

12. The delay in the Secretary's decision is not due to Plaintiff's bad faith.

13. On May 5, 2026, Plaintiff filed an Amended Whistleblower Complaint with OSHA (the "Amended OSHA Complaint") identifying additional and continuing acts of retaliation occurring after the OSHA Complaint, including the Retaliatory Lawsuit and the defamation campaign described herein. OSHA accepted the Amended OSHA Complaint as an amendment to the OSHA Complaint relating back to the original filing of October 30, 2025, and incorporated the amended allegations into the same case record under OSHA Case No. 301066409. OSHA acknowledged the Amended OSHA Complaint by letter from Regional Investigator William Rodriguez dated May 5, 2026, confirming that the supplemental allegations would be maintained as part of the existing case record associated with the complaint originally filed on October 30, 2025, and confirming that the acceptance of the amendment did not alter the status of the original complaint or its statutory timelines. More than 180 days have elapsed since the filing of the OSHA Complaint, the Secretary of Labor has not issued a final decision, and OSHA has accordingly initiated kick-out procedures under 26 U.S.C. § 7623(d)(2)(B)(i).

14. Pursuant to 26 U.S.C. § 7623(d)(2)(B)(i), Plaintiff is therefore entitled to bring an action at law or equity for de novo review in this Court as to all discrete retaliatory acts that are the subject of the OSHA Complaint and the Amended

OSHA Complaint, including (without limitation) the demotion, system lockout, termination and/or constructive discharge, repudiation of vested renewal-commission rights, defamation campaign, anonymous threatening communication, cease-and-desist letter, and the Retaliatory Lawsuit.

## PARALLEL STATE-COURT LITIGATION

15.    **Pending State-Court Action.** On November 7, 2025 — eight (8) days after Plaintiff filed the OSHA Complaint — Secure Care commenced the Retaliatory Lawsuit against Plaintiff in the Circuit Court of the Sixth Judicial Circuit in and for Pinellas County, Florida, styled *Secure Care 65, LLC v. Aaron Modugno*, Case No. 25-006327-CI (the "State Action"). On December 10, 2025, Secure Care filed an Amended Complaint in the State Action. Plaintiff has filed in the State Action a Motion to Dismiss and a Motion for Protective Order, and has also filed a Counterclaim against Secure Care 65, LLC and related counter-defendants asserting state-law claims under the Florida Private Sector Whistleblower Act, the Florida RICO Act and Fla. Stat. § 772.104, breach of contract, defamation per se, trade libel, and tortious interference (the "State Counterclaim").

16.    **Exclusive Federal Jurisdiction Over § 7623(d) Claims.** The state court does not have subject-matter jurisdiction over Plaintiff's claims under 26 U.S.C. § 7623(d). Section 7623(d)(2)(B)(i) confers de novo jurisdiction exclusively on

the United States district courts upon administrative kick-out, and provides a uniquely federal statutory remedy that no state-law claim duplicates. Plaintiff could not have asserted the § 7623(d) claims pleaded herein in the State Action and is not required to do so.

17. **No Compulsory-Counterclaim Bar; No Claim-Splitting.** Because the § 7623(d) claims pleaded herein are claims over which the state court lacks subject-matter jurisdiction, they are not compulsory counterclaims under Fla. R. Civ. P. 1.170(a). See Fla. R. Civ. P. 1.170(a)(2). The omission of these claims from the State Counterclaim does not waive them, does not constitute claim-splitting, and does not preclude this action. See *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380–86 (1985); *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 506–08 (2001). Any adjudication on the merits in the State Action will not have preclusive effect on the § 7623(d) claims pleaded herein because the state court has no authority to adjudicate them.

18. **Distinct Claims, Distinct Relief; No Duplicative Recovery.** The State Counterclaim asserts state-law claims under separate statutory frameworks with different elements, different burdens of proof, and different remedies than this federal action. Plaintiff brings this action solely for relief under 26 U.S.C. § 7623(d) and does not seek duplicative recovery for any element of

damages already pleaded in the State Counterclaim. Plaintiff stands ready to coordinate with the state court on case-management and discovery efficiencies as appropriate to avoid duplicative proceedings.

## FACTUAL ALLEGATIONS

19. In or about May 2019, Plaintiff was hired by Secure Care as an insurance agent.

20. At the time of hire, Secure Care promised Plaintiff that his residual commissions would vest after three years of continuous employment.

21. In or about the summer of 2022, Secure Care's President, Craig Winholtz, promoted Plaintiff to Sales Manager.

22. Plaintiff served Secure Care without disciplinary issue and earned consistently positive performance evaluations through August 2025.

23. In or about January 2025, Winholtz disclosed to Plaintiff an ongoing scheme involving offshore kickbacks from vendors in the Philippines (the "Pay and Return Scheme").

24. Specifically, Winholtz admitted that while Secure Care's 2024 financials reflected zero profit, he had secretly pocketed approximately $200,000 in unreported income through kickback arrangements with offshore vendors in the Philippines.

25.   The Pay and Return Scheme was deliberately structured to conceal substantial taxable income and to evade federal tax obligations in violation of 26 U.S.C. § 7201.

26.   Upon information and belief, Secure Care deducted the full payments made to the Philippine vendors as ordinary and necessary business expenses on its federal tax returns, notwithstanding that a portion constituted illegal kickbacks which are non-deductible under 26 U.S.C. § 162(c).

27.   Winholtz made this disclosure just prior to a business trip to Tupelo, Mississippi, to meet with a potential buyer (Justin Brock of Bobby Brock Insurance) for the partners' shares in the Company — a transaction that would have required accurate financial disclosures.

28.   Upon learning of the Pay and Return Scheme, Plaintiff immediately told Winholtz that the conduct was illegal tax evasion. Winholtz then promised Plaintiff that he would cease the illegal conduct.

29.   In or about April 2025, Plaintiff reported his concerns to Steve Williamson ("Williamson"), Secure Care's General Agent and partner, emphasizing Williamson's legal responsibility to report tax violations to appropriate authorities.

30.   Williamson acknowledged receipt of the information but did not take remedial action.

31. In the week of August 8, 2025, Winholtz confirmed to Plaintiff that the Pay and Return Scheme remained ongoing.

32. On Friday, August 8, 2025, Plaintiff left Secure Care's call center and met privately with Secure Care's owners, Tony Amico ("Amico") and Don Dean ("Dean"), in an adjoining office.

33. During that meeting, Plaintiff reported in good faith his reasonable belief that Winholtz and Secure Care were engaged in the following violations of the Internal Revenue Code and related laws:

   a. **Concealment of Income — 26 U.S.C. § 7201.** Winholtz had embezzled approximately $200,000 in 2024 through the Pay and Return Scheme, concealing this income from the IRS.

   b. **Non-Deductible Kickbacks — 26 U.S.C. § 162(c).** Secure Care was, upon information and belief, deducting the full amount of Philippine-vendor payments as business expenses, including amounts that constituted illegal kickbacks not deductible under § 162(c)(1) and (c)(2).

   c. **Willful Failure to Report Income.** Winholtz was selling Secure Care-owned insurance leads to third parties (including Greg Gurbickian) without reporting the income to the Company or to tax authorities.

34. Following Plaintiff's disclosures, Amico and Dean acknowledged that Winholtz had previously stolen money from Secure Care, confronted Winholtz about the embezzlement and tax fraud, received Winholtz's admission characterizing the payments as "kickbacks," and initially informed Plaintiff that Winholtz would be removed from the Company — stating, "Craig is out."

35. During the confrontation, Dean unplugged Winholtz's computer to prevent further conduct by Winholtz. Winholtz physically shoved Dean.

36. After a private meeting between Winholtz and the owners later that day, the owners reversed course. That evening, Winholtz sent Plaintiff a text message stating that Winholtz was "still in charge."

37. On Saturday, August 9, 2025 — within twenty-four (24) hours of Plaintiff's protected disclosures — Secure Care took the following adverse personnel actions:

   a. **System Lockout.** Secure Care revoked Plaintiff's access to all Company systems, including email, the Radius Bob customer-relationship-management system, and physical office access.

   b. **Interference with Job Performance.** The lockout prevented Plaintiff from servicing clients, accessing client information, processing insurance applications, or performing essential job functions.

c.    **Demotion.** When Plaintiff contacted Amico and Williamson to inquire about the lockout, they denied terminating him but stated that he must work remotely because "Craig is angry," removed him from his Sales Manager position, and refused to restore his system access despite acknowledging the unfairness of the situation.

38.    Plaintiff first learned of his exclusion from Company systems when a co-worker informed him she had noticed he was no longer on Microsoft Teams.

39.    The actions taken by Secure Care on Saturday, August 9, 2025 terminated Plaintiff's employment in substance and effect. On that day, Winholtz announced to the Secure Care workforce that Plaintiff was "terminated" and "locked out." Plaintiff's access to Company systems was never restored, his Sales Manager position was never reinstated, his clients were reassigned, and the daily indicia of continuing employment were all stripped and never returned.

40.    In the approximately two-week period that followed, Secure Care engaged in a brief sham "negotiation" designed to create the appearance of ongoing employment while making an actual return impossible. Secure Care refused to restore system access or any legitimate path for return.

41.    Williamson communicated the effective termination to Plaintiff. Specifically, Williamson told Plaintiff that he could work only "at home as an agent,"

stripped of his Sales Manager role, and that he could not come to the office "because Craig was mad" and because Plaintiff had "ratted him out." When Plaintiff pointed out to Williamson that Winholtz was "the criminal" and Plaintiff was the one without a job, Williamson agreed that the situation was "unfair."

42. At the same time, Secure Care conditioned any "return" on Plaintiff's execution of oppressive contractual concessions he had never previously been required to sign, including: (a) a non-competition agreement; (b) a non-solicitation agreement; (c) assignment of client information and documents lawfully possessed by Plaintiff; and (d) a waiver of the vested status he had operated under since 2019.

43. Winholtz texted Plaintiff: "your contract isn't coming from Tony," signaling that no legitimate return-to-work contract would be forthcoming.

44. Secure Care retained Winholtz — the admitted wrongdoer — in a position of authority while punishing Plaintiff, the whistleblower.

45. Plaintiff's employment with Secure Care ended on or about August 20, 2025 when, following the two-week period of stalling and refusal to restore his position or access, Plaintiff ceased efforts to obtain restoration and began establishing an independent business. To the extent Secure Care contends Plaintiff was not already terminated on August 9, 2025, the conditions

imposed during the two-week period were objectively intolerable and a reasonable person in Plaintiff's position would have felt compelled to end the employment relationship. In that alternative, Plaintiff was constructively discharged on or about August 20, 2025.

46. In September 2025, Plaintiff established an independent insurance business and worked with Williamson to obtain releases from his carrier contracts. Williamson represented that Secure Care's attorney would send Plaintiff a letter guaranteeing continued renewals if Plaintiff refrained from contacting Secure Care clients. No such letter was ever sent.

47. On October 5, 2025, Williamson came to Plaintiff's home to collect Plaintiff's company laptop and office key. Plaintiff had not accessed the laptop on or after August 8, 2025 and had not accessed Secure Care's Radius Bob system since August 8, 2025.

48. Following Plaintiff's departure, representatives of Secure Care contacted Plaintiff's clients and falsely stated that Plaintiff was "suffering from an illness" and unable to assist them.

49. Plaintiff received an anonymous threatening text message, the phrasing of which was nearly identical to a legal demand letter subsequently sent by Secure Care's counsel, suggesting the message originated from or was directed by Secure Care personnel.

50. On October 17, 2025, Secure Care, through its counsel FordHarrison LLP, sent Plaintiff a cease-and-desist letter containing false accusations of "unlawful access" and "theft of data," notwithstanding that Plaintiff had returned all Company property and had not accessed Secure Care's systems since August 8, 2025.

51. On October 30, 2025, Plaintiff filed the OSHA Complaint placing Secure Care on formal notice of his federal whistleblower claim.

52. On November 7, 2025 — just eight (8) days after Plaintiff filed his OSHA Complaint — Secure Care filed its original complaint against Plaintiff in the Circuit Court of the Sixth Judicial Circuit in and for Pinellas County, Florida, styled *Secure Care 65, LLC v. Aaron Modugno*, Case No. 25-006327-CI (the "Original Retaliatory Complaint").

53. On December 10, 2025, Secure Care filed a First Amended Complaint in the same action (the "Amended Retaliatory Complaint", and together with the Original Retaliatory Complaint, the "Retaliatory Lawsuit"), broadening its allegations and substantially increasing the burden on Plaintiff of defending against the action.

54. The Retaliatory Lawsuit asserts claims for trade secret misappropriation under the Florida Uniform Trade Secrets Act ("FUTSA") and for breach of contract. The FUTSA claim was not filed to vindicate any genuine intellectual-property

interest. It was filed as a retaliatory tool — the kind of strategic litigation against employee whistleblowers that 26 U.S.C. § 7623(d) was enacted to prevent — designed to silence Plaintiff, to impose ruinous defense costs on a former rank-and-file Sales Manager, to coerce Plaintiff into abandoning his federal whistleblower rights and the very action he now brings before this Court, and to deter other Secure Care employees from reporting tax fraud. The FUTSA claim is patently frivolous on its own terms. Each claim lacks legal and factual merit:

a.      The Retaliatory Lawsuit is pleaded almost entirely "upon information and belief," a deficiency Secure Care's own counsel conceded in response to Plaintiff's motion to dismiss.

b.      The solicitation letter attached as an exhibit to the Retaliatory Lawsuit — and which forms the centerpiece of Secure Care's trade-secret claim — expressly states: "Having helped you with your existing policy, I already know you and your coverage," thereby admitting that Plaintiff's client knowledge was derived from lawful employment, not from any misappropriated trade secret.

c.      Plaintiff never signed a non-competition agreement, a non-solicitation agreement, or a standalone confidentiality agreement with Secure Care.

d.   The "Confidentiality Agreement" relied upon by Secure Care in the Retaliatory Lawsuit is page 5 of a HIPAA-compliance handbook, contains no signature line, and was drafted on a generic off-the-shelf HIPAA form.

e.   Secure Care's own allegations establish that Plaintiff's system credentials remained active post-resignation, and that any post-resignation access occurred through normal system authentication.

f.   Plaintiff is the lawful agent of record on the policies at issue; Secure Care has only a commission-assignment relationship and a HIPAA business-associate authorization.

g.   The Retaliatory Lawsuit fails to identify any trade secret with the particularity required under Florida law and fails to allege any specific use or threatened use of allegedly misappropriated information by Plaintiff. The pleading rests entirely on the unremarkable assertions that, during his employment as Sales Manager, Plaintiff accessed Secure Care's customer-relationship-management system and other Company systems — access he was authorized and indeed required to perform his job — and that his system credentials remained active for a period after August 8, 2025 because Secure Care itself failed to deactivate them. Conspicuously absent from the Retaliatory Lawsuit

are any allegations identifying the specific files, customer information, or data alleged to constitute a trade secret; describing how Plaintiff has used or threatens to use any such information; quantifying any competitive harm to Secure Care; or identifying any economic benefit derived by Plaintiff from any alleged misappropriation. The Retaliatory Lawsuit thus repackages authorized, in-role employee conduct as misappropriation — the hallmark of a sham pleading filed for retaliatory ends rather than to vindicate any cognizable intellectual-property interest.

55. Secure Care's Retaliatory Lawsuit was filed for the improper purpose of punishing Plaintiff for his protected activity, deterring him from pursuing his federal whistleblower rights, and imposing litigation costs that would dissuade a reasonable employee from reporting tax fraud. It constitutes a materially adverse action under *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

## COUNT I — RETALIATION IN VIOLATION OF 26 U.S.C. § 7623(d)

*(26 U.S.C. § 7623(d))*

56. Plaintiff realleges and incorporates by reference paragraphs 1 through 55 above (the General Allegations) as if fully set forth herein.

57. Defendant Secure Care 65, LLC is a "person" subject to 26 U.S.C. § 7623(d)(1).

58. Plaintiff was an employee of Defendant at all times material hereto.

59. Section 7623(d)(1) protects current and former employees against retaliation for protected whistleblowing activity, and accordingly protects Plaintiff with respect to all conduct alleged herein, including conduct occurring after the August 9, 2025 demotion / termination.

60. 26 U.S.C. § 7623(d)(1) prohibits retaliation against an employee because of any lawful act done by the employee "to provide information, cause information to be provided, or otherwise assist in an investigation regarding underpayment of tax or any conduct which the employee reasonably believes constitutes a violation of the internal revenue laws or any provision of Federal law relating to tax fraud."

61. Plaintiff engaged in protected activity under § 7623(d)(1) by:

    a. **January 2025 internal report to Winholtz.** Plaintiff told Winholtz that the Pay and Return Scheme constituted illegal tax evasion.

    b. **April 2025 report to Williamson.** Plaintiff reported the Pay and Return Scheme to Williamson, Secure Care's General Agent and partner, and emphasized Williamson's legal responsibility to report the conduct to appropriate authorities.

c. **August 8, 2025 report to owners Amico and Dean.** Plaintiff reported the Pay and Return Scheme to Amico and Dean — persons with supervisory authority over Plaintiff — describing it specifically as tax evasion under the Internal Revenue Code and as conduct prohibited by 26 U.S.C. §§ 7201 (attempt to evade or defeat tax), 7202 (willful failure to collect or pay over tax), 7206 (fraud and false statements), and 162(c) (non-deductibility of illegal kickbacks), and refusing to participate in any new entity or transaction perpetuating the scheme.

d. **October 30, 2025 OSHA Complaint.** Plaintiff filed a formal whistleblower-retaliation complaint with the U.S. Department of Labor, Occupational Safety and Health Administration, Office of Whistleblower Protection Programs.

62. Plaintiff held a good-faith, objectively reasonable belief that the conduct he reported constituted underpayment of tax and violations of the internal revenue laws, including 26 U.S.C. §§ 7201, 7202, 7206, and 162(c). Plaintiff's belief was founded on Winholtz's own express admissions that the Philippine-vendor payments were "kickbacks," that he had "pocketed" approximately $200,000 in unreported income, and that the payments were concealed from the Internal Revenue Service.

63. Defendant, through its owners Amico and Dean, its General Agent Williamson, and its President Winholtz, had actual knowledge of Plaintiff's protected activity. Each of those decision-makers was either the direct recipient of Plaintiff's objections and reports or was promptly informed of them. Defendant additionally received formal notice of the OSHA Complaint following its filing on October 30, 2025.

64. Beginning on August 9, 2025 — within twenty-four (24) hours of Plaintiff's August 8, 2025 protected disclosure — and continuing thereafter, Defendant took multiple discrete unfavorable personnel actions against Plaintiff within the meaning of 26 U.S.C. § 7623(d)(1). Each of the following is a discrete adverse act, and each is independently sufficient to support liability under § 7623(d):

   a. **Demotion from Sales Manager.** On August 9, 2025, Defendant demoted Plaintiff from his Sales Manager position to a non-managerial at-home agent role, stripping him of supervisory authority, his commission override on supervised agents, and his on-premises office and team. Williamson personally directed the demotion in two telephone calls on Saturday, August 9, 2025, in which Williamson told Plaintiff that he "would not be Manager" and that he could not return to the office "because Craig is angry."

b.    **System Lockout.** On August 9, 2025, Defendant revoked Plaintiff's access to all Company systems, including email, the Radius Bob CRM, Microsoft Teams, and physical office access, preventing Plaintiff from servicing existing clients, accessing client information, or processing insurance applications.

c.    **Stripping of Job Functions.** On and after August 9, 2025, Defendant prohibited Plaintiff from servicing existing clients, processing new business, or earning commissions on new business, during a critical seasonal period for renewals and new appointments.

d.    **Public Broadcast of Removal.** On and after August 9, 2025, Defendant broadcast Plaintiff's removal to fellow employees by removing him from Microsoft Teams and otherwise publicly signaling his exclusion from the Company.

e.    **Termination of Employment.** The conduct of August 9, 2025 and immediately thereafter terminated Plaintiff's employment in substance and effect. Under federal employment law, an employee is terminated when the employer's conduct manifests an intent to end the employment relationship, regardless of whether the employer uses the words "fired," "discharged," or "terminated." Defendant's subsequent two-week stalling, refusal to restore access, demands that Plaintiff

execute oppressive and unprecedented waivers, and Winholtz's text-message statement that "your contract isn't coming from Tony" were not a continuing employment relationship; they were post-termination conduct designed to create the appearance of ongoing employment while foreclosing any genuine return.

f.   **Constructive Discharge (alternative).** To the extent the Court finds that Plaintiff was not actually terminated on August 9, 2025, Plaintiff alternatively alleges that Defendant constructively discharged him on or about August 20, 2025 by making it impossible for him to return to work under any reasonable conditions, including by refusing to restore Plaintiff's access or his management position; demanding execution of unprecedented non-compete, non-solicitation, and assignment-of-client-information agreements; demanding that Plaintiff waive his vested residual commission rights worth hundreds of thousands of dollars; refusing to provide any written assurances regarding vesting, compensation, or return terms; retaining the admitted wrongdoer Winholtz in a position of authority over Plaintiff; and preventing Plaintiff from servicing clients during a critical seasonal renewal period.

g.  **Repudiation of Vested Renewal-Commission Rights.** Beginning on August 9, 2025 and continuing thereafter, Defendant repudiated Plaintiff's vested post-employment renewal-commission rights under the 2019 vesting agreement, including by refusing to honor those rights upon Plaintiff's separation; demanding waiver of those rights as a precondition of any return; and implementing the fraudulent-signature scheme described in the General Allegations to strip Plaintiff of the agent-of-record economics underlying those vested rights.

h.  **Defamation Campaign Directed at Plaintiff's Clients.** Following Plaintiff's separation, Defendant's representatives contacted Plaintiff's clients and falsely stated that Plaintiff was "suffering from an illness" and unable to assist them — materially adverse statements made and re-published to dissuade Plaintiff's clients from continuing their business relationships with him.

i.  **Anonymous Threatening Text Message.** On October 11, 2025, Plaintiff received an anonymous threatening text message, the phrasing of which was nearly identical to a legal demand letter subsequently sent on Defendant's behalf, suggesting that the message originated from or was directed by Defendant.

j.    **Cease-and-Desist Letter.** On October 17, 2025, Defendant, through its counsel, sent Plaintiff a cease-and-desist letter containing false accusations of "unlawful access" and "theft of data," notwithstanding that Plaintiff had returned all Company property on October 5, 2025 and had not accessed Secure Care's systems since August 8, 2025. The letter also purported to bar Plaintiff from contacting Secure Care clients — including clients for whom Plaintiff is the lawful agent of record — further worsening the terms of his post-employment relationship with Defendant.

65.    Each of the foregoing discrete acts, individually and in combination, constituted a materially adverse change in the terms, conditions, location, or privileges of Plaintiff's employment, and would dissuade a reasonable employee from making or supporting a charge of discrimination. The discrete acts are pleaded in the alternative and in combination, such that liability attaches if any one of them is established.

66.    Plaintiff's protected activity was a contributing factor in each of the discrete unfavorable personnel actions alleged above, as established by:

a.    **Temporal Proximity.** The twenty-four (24) hour proximity between Plaintiff's August 8, 2025 protected disclosure and the August 9, 2025 lockout, demotion, and termination.

b. **Direct Statement of Motive.** Defendant's express explanation that Plaintiff was required to work remotely because "Craig is angry" — directly acknowledging that the adverse actions were motivated by Winholtz's reaction to Plaintiff having reported the Pay and Return Scheme to the owners.

c. **Acknowledgment of Unfairness.** Williamson's contemporaneous acknowledgment that the adverse actions were "unfair."

d. **Retention of the Wrongdoer.** Defendant's retention of Winholtz — the admitted tax-evader — in a position of authority while punishing Plaintiff for reporting him.

e. **Absence of Legitimate Reason.** The absence of any legitimate, non-retaliatory business reason for any of the discrete adverse actions.

f. **Prior Satisfactory Performance.** Plaintiff's prior satisfactory performance, including his summer-2022 promotion to Sales Manager and continued favorable performance through August 2025.

67. Defendant cannot demonstrate by clear and convincing evidence that it would have taken any of the discrete adverse actions in the absence of Plaintiff's protected activity. 26 U.S.C. § 7623(d)(2)(B)(iii); 49 U.S.C. § 42121(b)(2)(B)(iv).

68.    As a direct and proximate result of Defendant's violations of 26 U.S.C. § 7623(d), Plaintiff has suffered and continues to suffer damages, including without limitation: (a) lost wages and back pay; (b) lost commissions and renewal commissions; (c) lost vested residual commissions worth hundreds of thousands of dollars; (d) emotional distress; (e) reputational harm; (f) loss of professional standing; and (g) all special damages, litigation costs, expert-witness fees, and reasonable attorneys' fees pursuant to 26 U.S.C. § 7623(d)(3)(A)(iii). Pursuant to 26 U.S.C. § 7623(d)(3)(A), Plaintiff is entitled to all relief necessary to make him whole, including without limitation: (i) reinstatement with the same seniority status he would have had but for the reprisal; (ii) the sum of 200 percent of the amount of back pay and 100 percent of all lost benefits, with interest; and (iii) compensation for all special damages sustained as a result of the reprisal, including litigation costs, expert-witness fees, reasonable attorneys' fees, and damages for emotional distress and reputational harm.

## WHEREFORE

69.    Plaintiff demands judgment against Defendant Secure Care 65, LLC for: (a) reinstatement to his former position with the same seniority status, override compensation, and full restoration of access; (b) the sum of 200 percent of the

amount of back pay and 100 percent of all lost benefits, with interest, pursuant to 26 U.S.C. § 7623(d)(3)(A)(ii); (c) compensation for all special damages sustained as a result of the retaliation, including damages for emotional distress and reputational harm, pursuant to 26 U.S.C. § 7623(d)(3)(A)(iii); (d) reasonable attorneys' fees, expert-witness fees, and litigation costs pursuant to 26 U.S.C. § 7623(d)(3)(A)(iii); (e) injunctive relief barring Defendant from any further acts of retaliation; and (f) such other and further relief as this Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Aaron Modugno respectfully requests that this Court enter judgment in his favor and against Defendant Secure Care 65, LLC, and:

A.    Declare that Defendant's conduct violated 26 U.S.C. § 7623(d);

B.    Order Defendant to reinstate Plaintiff to his former position with the same seniority status, or award front pay in lieu of reinstatement;

C.    Pursuant to 26 U.S.C. § 7623(d)(3)(A)(ii), award Plaintiff the sum of 200 percent of the amount of back pay and 100 percent of all lost benefits, with interest, and including lost wages, lost commissions, and lost vested residuals;

D.    Award Plaintiff all special damages sustained as a result of the retaliation, including litigation costs, expert-witness fees, and reasonable attorneys' fees, pursuant to 26 U.S.C. § 7623(d)(3)(A)(iii);

E.    Award Plaintiff special damages, including damages for emotional distress and reputational harm, pursuant to 26 U.S.C. § 7623(d)(3)(A)(iii);

F.    Enjoin Defendant from any further acts of retaliation against Plaintiff and require Defendant to dismiss the Retaliatory Lawsuit with prejudice;

G.    Refer the underlying tax violations to the Internal Revenue Service for appropriate civil and criminal investigation; and

H.    Grant such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

70.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

Dated: May 29, 2026
Respectfully submitted,

/s/ Frank M. Malatesta
**Frank M. Malatesta, Esq.**
Florida Bar No. 0097080
**MALATESTA LAW OFFICE**
871 Venetia Bay Boulevard, Suite 235

Venice, Florida 34285
Telephone: (941) 256-3812
Facsimile: (888) 501-3865
Email: Frank@Malatestalawoffice.com

Staff@malatestalawoffice.com

Heather@malatestalawoffice.com

*Attorney for Plaintiff Aaron Modugno*